## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RACHELLE LAWRENCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Civil Action No. 11-cv-1854 (KBJ) |
| | ) |
| JACOB J. LEW, *Secretary of the Treasury*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## MEMORANDUM OPINION ADOPTING THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

Plaintiff Rachelle Lawrence ("Plaintiff") has sued the Department of the Treasury ("Defendant"), alleging that the agency discriminated against her on the basis of her sex, race, and age, and retaliated against her for participating in protected activity in violation of Title VII of the Civil Rights Act of 1962, 42 U.S.C. §§ 2000e–2000e-17, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621–634. Plaintiff's claims in this matter relate to two settlement agreements that she entered into with Defendant pertaining to a prior discrimination and retaliation complaint that Plaintiff had filed against Defendant—one dated February 2008 ("February Agreement") and the other dated October 2008 ("October Agreement")—and the allegations of the instant complaint also concern a circumstance that arose during the execution of those settlement agreements; specifically, Defendant's apparent realization that it had overpaid Plaintiff under the terms of the agreements and its garnishment of her subsequent wages to recoup those overpayments. On February 10, 2014, Defendant moved for judgment on the pleadings and for summary judgment (ECF

No. 29), a motion that Plaintiff opposed (ECF No. 33).  On April 21, 2015, nearly a year after Defendant's motion became ripe for this Court's consideration, Plaintiff moved for leave to amend her complaint (ECF No. 38), seeking to add allegations related to different discrimination complaints that Plaintiff filed in 2013 and 2014.  On February 24, 2015, this Court referred this matter to a Magistrate Judge for full case management.

Before this Court at present is the Report and Recommendation that the assigned Magistrate Judge, G. Michael Harvey, has filed regarding Defendant's motion for judgment on the pleadings and for summary judgment and Plaintiff's motion for leave to amend her complaint.  (*See* ECF No. 40.)  The Report and Recommendation, which is attached to this Memorandum Opinion, reflects Magistrate Judge Harvey's opinion that this Court should treat Defendant's motion as one for summary judgment, and so construed, should grant that motion and deny Plaintiff's motion for leave to amend her complaint.  (*Id.* at 1.)  Specifically, Magistrate Judge Harvey first finds that Plaintiff's response to Defendant's statement of material facts largely fails to meet the requirements of this Court's Rules or the Federal Rules of Civil Procedure, as it is argumentative and in many instances fails to cite to the factual record.  (*Id.* at 2–6.)  He further finds that Plaintiff's claim that she was coerced into signing the October Agreement fails both because she has not established any adverse employment action, and also because she has not shown that Defendant did anything more than encourage her to sign the agreement or that Defendant was animated by discriminatory or retaliatory motive in offering such encouragement.  (*Id.* at 19–24.)  With respect to her claims regarding purported breach of the February Agreement, Magistrate Judge Harvey

finds that the exclusive forum for any such claim is the Court of Federal Claims and not this Court, and that even if this Court could hear her claim, Defendant has offered legitimate, non-discriminatory reasons—reasons that Plaintiff has failed to rebut—for any violations of the February Agreement.  (*Id.* at 25–35.)  The Report and Recommendation further finds that Plaintiff's wage garnishment claim fails because Defendant has offered legitimate, non-discriminatory, and unrebutted reasons the garnishment.  (*Id.* at 35–36.)  Finally, Magistrate Judge Harvey recommends that this Court deny Plaintiff's motion for leave to amend her complaint to add allegations regarding additional EEO complaints that Plaintiff filed in 2013 and 2014, finding that the proposed amendment would broaden the scope of this litigation, delay trial of this matter, and unduly prejudice Defendant.  (*Id.* at 36–39.)

Magistrate Judge Harvey's Report and Recommendation further advises the parties that the failure to file timely objections may result in waiver of further review of the matters addressed in the Report and Recommendation.  (*Id.* at 40.)  Under this Court's local rules, any party who objects to a Report and Recommendation must file a written objection with the Clerk of the Court within 14 days of the party's receipt of the Report and Recommendation.  LCvR 72.3(b).  As of this date—over a month after the Report and Recommendation was issued—no objections have been filed.

This Court has reviewed Magistrate Judge Harvey's report and agrees with its careful and thorough analysis and conclusions.  Therefore, the Court will **ADOPT** the Report and Recommendation in its entirety.  Accordingly, as set forth in the separate Order accompanies this Memorandum Opinion, Defendants' [29] Motion for Judgment

on the Pleadings and for Summary Judgment will be **GRANTED** and Plaintiff's [38]

Motion for Leave to Amend Her Complaint will be **DENIED**.

DATE:  January 12, 2016

*Ketanji Brown Jackson*

KETANJI BROWN JACKSON
United States District Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

                   )

**RACHELLE LAWRENCE**     )

                   )

        **Plaintiff,**     )

                   )

**v.**                  )     **Case No. 11-cv-1854 (KBJ/GMH)**

                   )

**JACOB LEW, in his official capacity as**  )

**SECRETARY, UNITED STATES**   )

**DEPARTMENT OF THE TREASURY**  )

                   )

        **Defendant.**    )

_____)

**REPORT AND RECOMMENDATION**

Plaintiff, Rachelle Lawrence, brings this action against her employer, the Department of the Treasury, alleging that it discriminated against her based on her sex, race, and age, and retaliated against her for participating in protected Equal Employment Opportunity ("EEO") activity in violation of Title VII of the Civil Rights Act of 1962, 42 U.S.C. § 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. This case was referred to the undersigned for full case management on February 24, 2015. Before the undersigned are two motions: (1) defendant's motion for judgment on the pleadings and for summary judgment and (2) plaintiff's motion to amend her complaint. Upon consideration of the motions, the undersigned recommends that defendant's motion be granted and plaintiff's motion be denied.[1]

_____

[1] The relevant docket entries for purposes of this Report and Recommendation are: (1) Plaintiff's First Amended Complaint ("Am. Compl.") [Dkt. 9-1]; (2) Defendant's Motion for Judgment on the Pleadings and for Summary Judgment ("Def. Mot.") [Dkt. 29]; (3) Plaintiff's Response to Defendant's Motion for Judgment on the Pleadings and for Summary Judgment ("Pl. Opp.") [Dkt. 33]; (4) Defendant's Reply in Support of His Motion for Judgment on the Pleadings and for Summary Judgment ("Def. Reply") [Dkt. 37]; (5) Plaintiff's Motion for Leave to Amend Her

## BACKGROUND

### A.     Plaintiff's Response to Defendant's Statement of Material Facts

As in every motion for summary judgment,[2] defendant, the movant, submitted a statement of material facts which defendant claims support the entry of summary judgment against plaintiff.  See Def. Mot., Statement of Material Facts ("SOF").  Plaintiff, in turn, responded to defendant's statement of facts.  See Pl. Opp., SOF.  Based on those submissions, the undersigned must determine which material facts, if any, remain in dispute.  Accordingly, before the undersigned can set forth the facts pertinent to the adjudication of defendant's motion, the undersigned must address that threshold matter.

The facts set forth in Part B of this section are compiled primarily from the facts submitted in connection with defendant's motion which went unchallenged by plaintiff in her response.  See L. Civ. R. 7(h) ("In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.").  Where relevant facts are properly disputed, those disputes are addressed as they arise in the analysis.  Facts not properly disputed are treated as conceded.  The undersigned's reasons for doing so are explained below.

In her response to defendant's motion, plaintiff often attempts to raise a dispute of fact but fails to meet the standards for doing so imposed by Federal Rule of Civil Procedure 56 and

---

First Amended Complaint ("Pl. Mot. Am.") [Dkt. 38]; and (6) Defendant's Response to Plaintiff's Motion for Leave to Amend Her First Amended Complaint ("Def. Opp. Am.") [Dkt. 39].

[2] Defendant brought a Rule 12(c) motion for judgment on the pleadings and, in the alternative, a Rule 56 motion for summary judgment.  Def. Mot. at 7–8.  However, when a party bringing a Rule 12(c) motion attaches material outside of the pleadings, the motion is reviewed as a motion for summary judgment under Rule 56.  Fed. R. Civ. P. 12(d).  Defendant has done just that.  See Def. Mot. at 8.  Accordingly, the undersigned will construe defendant's motion as a motion solely for summary judgment.

our Local Rules.  Rule 56 requires a party disputing an asserted fact to support the dispute with

citation to "particular parts of materials in the record."  Fed. R. Civ. P. 56(c)(1).  The Rule

further states that a court need not consider materials not cited by a party in determining whether

a genuine dispute of fact exists.  Id. 56(c)(3).  Finally, the Rule warns that failing to properly

address a fact permits a court to find that the fact is undisputed for purposes of the summary-

judgment motion.  Id. 56(e).  Similarly, Local Rule 7(h) provides, in relevant part:  "[a]n

opposition to . . . a motion [for summary judgment] shall be accompanied by a separate concise

statement of genuine issues setting forth all material facts as to which it is contended there exists

a genuine issue necessary to be litigated, which shall include references to the parts of the record

relied on to support the statement."  L. Civ. R. 7(h) (emphasis added).

 Our Court of Appeals has repeatedly warned litigants against shirking their duties under

Rule 56 and Local Rule 7(h) in responding to motions for summary judgment.  For example, in

Jackson, the D.C. Circuit upheld the decision of the district court to grant summary judgment to

the defendant on the basis that the plaintiff had not properly responded to the defendant's

assertions of fact.  Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner, 101 F.3d 145,

151 (D.C. Cir. 1996).  There, the plaintiff failed to cite to parts of the factual record and instead

"blend[ed] factual assertions with argument regarding their legal significance."  Id. at 148.  The

district court found such responses inadequate under the predecessor to our Local Rule 7(h) and

concluded that the defendant's statements of fact were therefore undisputed.  Id.  The D.C.

Circuit affirmed, noting that the district court need not comb through the factual record to ferret

out disputes of material fact.  Id. at 151.  Instead, rules like our Local Rule 7(h) appropriately

"plac[e] the burden on the parties and their counsel, who are most familiar with the litigation and

the record, to crystallize for the district court the material facts and relevant portions of the

record."  Id.  The Court of Appeals further observed that the plaintiff's attempt at a response was

wholly inadequate:

> [Plaintiff's] "relevant facts" section fails functionally to comply with the [local]
> rule's plain terms and purpose.  Twenty-nine pages long, the section hardly
> complies with the rule's requirement that statement [sic] of genuine disputed
> material issues be "concise."  Replete with factual allegations not material to
> [plaintiff's] substantive claims and repeatedly blending factual assertions with
> legal argument, the "relevant facts" section does not satisfy the purposes of a Rule
> 108(h) statement.  In order to identify material disputed issues that would
> preclude the entry of summary judgment, the court would have to sift and sort
> through the record, that is, engage in time-consuming labor that is meant to be
> avoided through the parties' observance of Rule 108(h).

Id. at 153.  Indeed, the D.C. Circuit found that a district court can reject a deficient response to a

statement of facts without first evaluating whether the failure was willful or prejudiced the

movant.  Id.  Instead, the district court has broad discretion to excuse, or not excuse, such

failures.  Id.; see also Twist v. Meese, 854 F.2d 1421, 1425 (D.C. Cir. 1988) (finding that the

district court is not "obliged to sift through hundreds of pages of depositions, affidavits, and

interrogatories in order to make [its] own analysis and determination of what may, or may not, be

a genuine issue of material disputed fact"); SEC v. Banner Fund Int'l, 211 F.3d 602, 616 (D.C.

Cir. 2000) (district court was "fully justified in treating as admitted [plaintiff's] statement of

material facts" where defendant failed to "poin[t] to specific parts of the record controverting"

those facts); Robertson v. Am. Airlines, Inc., 239 F. Supp. 2d 5, 9 (D.D.C. 2002) (striking

movant's statement of facts for "liberally mix[ing] facts with argument" which "does nothing to

assist the court in isolating the material facts, distinguishing disputed from undisputed facts, and

identifying the pertinent parts of the record"); Gibson v. Office of Architect of the Capitol, No.

Civ.A.00–2424(CKK), 2002 WL 32713321, at *1 (D.D.C. Nov. 19, 2002) (finding that non-

movant's response to statement of facts violated local rule because it was "not 'concise'," was

"devoid" of references to parts of the factual record, "rarely address[ed] the facts," and included

"excess, unresponsive verbiage"); <u>Williams v. Court Servs. & Offender Supervision Ag. for</u>

<u>D.C.</u>, Case No. 08–cv–1538 (RCL), 2015 WL 3876602, at *1 (D.D.C. June 22, 2015) (striking

response to statement of facts where responses were "replete with argument, speculation,

conjecture, and assumptions," were voluminous, not concise, and failed to cite to record

evidence).

Here, plaintiff's responses to defendant's statement of material facts fall woefully short

of the requirements of Rule 56 and Local Rule 7(h).  Many of plaintiff's responses fail to cite to

<u>any</u> part of the factual record.  <u>See</u> Pl. Opp., SOF ¶¶ 6, 17, 19, 23, 27, 30, 33–35, 37, 38–43, 46,

47, 51, 52, 57.  In some instances where plaintiff does cite to some part of the record, it appears

that plaintiff intended to cite to her affidavit or some other document and simply failed to

provide a sufficiently complete or specific citation.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶¶ 23, 30, 33, 35, 39, 42, 47

(citing to "Declaration" without further indication of page or paragraph numbers); <u>id.</u> ¶ 38 (citing

to "Plt's Exh no. ??"); <u>id.</u> ¶ 53 (citing to "Def. Exh. ??").  At other times, it appears plaintiff

simply left her thought unfinished.  <u>See</u>, <u>e.g.</u>, <u>id.</u> ¶ 43 (ending response with incomplete

sentence).  Most of plaintiff's responses, whether they cite to the factual record or not, fail to

meaningfully respond to defendant's factual assertions.  Indeed, many of them do not address

whether the stated fact is true or false.  Instead, they are replete with argument and speculation

which is out of place in a statement of facts.  <u>See</u>, <u>e.g.</u>, ¶¶ 6, 14, 17–19, 21, 23, 27, 30, 34, 37, 41,

42, 46, 51, 56, 57.

In essence, plaintiff has submitted a half-composed draft of a response to defendant's

statement of facts.  <u>See</u> <u>Robinson v. Dist. of Columbia</u>, Civil Action No. 09–2294 (JEB), 2015

WL 5442434, at *4 (D.D.C. Sept. 15, 2015) (chiding non-movant for submitting response to

summary judgment "with a fit and finish more akin to a law student's hastily drafted exam

response than a professional, well-groomed submission").  The scattered, incomplete, and vague nature of plaintiff's responses makes the work of the Court more onerous.  It is not the burden of this Court to defend plaintiff against summary judgment.  Instead, the burden is hers.  The undersigned declines plaintiff's invitation to do the heavy lifting for her in this case.

### B.    Relevant Facts

The relevant facts, drawn from facts submitted by defendant which went undisputed or were inadequately disputed by plaintiff, as well as the factual record submitted to the Court, are as follows:

Plaintiff is an African American female over the age of forty who, at all times relevant to this complaint, was an employee of the Bureau of Engraving and Printing, U.S. Department of the Treasury, in Washington, D.C. ("BEP").  Def. Mot., SOF ¶ 1.  Plaintiff commenced her employment with BEP in 2004 as a police officer.  Id. ¶ 2.  She brings one ADEA claim and three Title VII claims against her employer.  See Am. Compl. at 8–9.

In 2007, plaintiff filed an EEO discrimination complaint against BEP alleging that she was subjected to a hostile work environment motivated by her gender and prior engagement in protected EEO activities.  Id. ¶¶ 5–6.  The instant case arises from settlement proceedings which followed plaintiff's 2007 EEO complaint.  See Am. Compl.[3]  In those settlement negotiations, defendant was represented by Will Levy, then-Chief of Security and the person with settlement authority in relation to plaintiff's EEO complaint.  Id. ¶ 8.  In February 2008, the parties entered into a settlement agreement in an attempt to resolve the 2007 EEO complaint (the "February Agreement").  Def. Mot., SOF ¶ 8.  Plaintiff believes that defendant entered into the February Agreement in good faith.  Pl. Opp., SOF ¶ 14.

---

[3] Plaintiff's claims in the instant case do not relate to the substance of her 2007 EEO complaint.  Pl. Opp., SOF ¶ 6 ("[T]he [2007] EEO claim has little relevance, other than to provide a basis for retaliation.").

The February Agreement detailed plaintiff to a Security Specialist, Adjudicator position at BEP.  Def. Mot., SOF ¶ 9.  This was plaintiff's first detail to a Security Adjudicator position. Id. ¶ 12.  While plaintiff had received prior details at BEP, those details had duties that differed from the duties of a Security Adjudicator.  Id. ¶¶ 12–13.  Accordingly, the February Agreement required defendant to provide plaintiff with basic training for the Security Adjudicator position. Def. Mot., Ex. D ¶ 1(b).

Prior to plaintiff's detail to the Security Adjudicator position, she served as a BEP police officer at the TR-8 grade level.  Am. Compl. ¶ 6.  The Security Adjudicator position was a civilian government employee position that fell under the GS pay scale.  See Def. Mot., Ex. D.[4] At the time of the February Agreement, there was a "mismatch" between the TR and GS pay scales; a 1990 BEP policy required TR-8 employees like plaintiff to transfer to the GS-7 level, a level providing a substantially decreased salary from the TR-8 level.  Def. Mot., Ex. V; Def. Mot., SOF ¶ 53.  Accordingly, the February Agreement provided that plaintiff would continue to receive her pay at the TR-8 level while on Security Adjudicator detail.  Def. Mot., SOF ¶ 9; Def. Mot., Ex. D, ¶ 1(a).  The Agreement further stated:

> In the future, when Chief Levy is able to get the TR position scales to meet GS position scales, Ms. Lawrence will accept the matching grade level for her current pay scale.  It will be up to Ms. Lawrence, from that point forward, to meet the performance requirements of the job in order to take advantage of future openings for advancement in the Department.  Future potential grade advances will be competed.

Def. Mot., Ex. D, ¶ 1(c); Def. Mot., SOF ¶ 11.  The February Agreement, however, did not specify the GS pay grade and step plaintiff would receive when the TR and GS pay scales were brought into alignment.  See Def. Mot., Ex. D, ¶ 1(c).

---

[4] The TR pay scale defines salaries for police officers at BEP, while the GS pay scale is for civilian government employees.

In June 2008, following the execution of the February Agreement, Chief Levy undertook ultimately unsuccessful efforts to align the TR and GS pay scales.  Specifically, he wrote a memorandum to the manager of Human Resources, Karen Bickle, which was copied to the Associate Director of Management, Scott Wilson.  Def. Mot., Ex. V at 3–4.  Chief Levy's memorandum detailed his concerns with the unfairness imposed upon a BEP employee who transferred from a TR law enforcement position into a civilian GS position under the 1990 policy.  Id. at 5.

Despite Chief Levy's efforts, the non-alignment between the TR and GS pay scales was not changed in 2008.  See Def. Mot., SOF ¶¶ 14–15.  It was not until December 2012 (after Chief Levy was promoted to Associate Director of Management) that BEP was able to obtain more flexibility in paying law enforcement employees when they transferred to a civilian position on the GS scale.  Id. ¶ 15.  Even under the amended policy, however, a TR-8 law enforcement employee like plaintiff seeking transfer into a civilian position would be transferred into a GS-7 position, which, absent pay retention, would not compensate the transferee at the same rate he or she received as a TR-8.  Id.

In 2008, plaintiff requested that she be permanently transferred from her police officer position to the Security Specialist, Adjudicator position.  Id. ¶ 18.  Chief Levy requested that BEP's human resources office do so and provided the department a copy of the February Agreement.  See id. ¶ 19.  However, the human resources department refused to process the transfer under the February Agreement.  Id. ¶ 20.[5]

---

[5] Defendant asserts that the February Agreement did not provide for a permanent transfer, while plaintiff argues that the February Agreement unequivocally stated that she would be permanently transferred to her new detail.  Compare Def. Mot., SOF ¶ 20, with Pl. Opp., SOF ¶ 20.  The proper interpretation of the February Agreement is immaterial to the disposition of this case, as explained below.  See infra at 23–33.  For present purposes, it is enough to note that the transfer did not occur at this time.

In October 2008, to effectuate the plaintiff's permanent transfer into the Security Adjudicator position, the parties entered into a second settlement agreement (the "October Agreement").  Id. ¶¶ 21, 28.  The parties discussed the terms of the agreement over a period of months.  Id. ¶ 21.  Plaintiff had several meetings with BEP representatives in which she negotiated the terms of the Agreement.  Id. ¶ 23.  BEP informed plaintiff that if she chose not to sign the October Agreement, she could re-enter the EEO process and that the terms of the February Agreement would be considered met in full.  Id. ¶ 27.[6]

Plaintiff retained counsel to assist her during the negotiations over the October Agreement.  Id. ¶ 22.  The October Agreement allowed plaintiff twenty-one days to consider its terms and provided a seven-day revocation period.  Id. ¶ 36; Def. Mot, Ex. A ¶ 10.  The October Agreement nullified and superseded the February Agreement, providing, in relevant part:

> The parties entered into an initial settlement agreement ("original Agreement") on February 25, 2008. By signing this agreement, the parties agree to nullify the original agreement, and implement this amended agreement, and implement this amended Agreement ("Agreement 2") in its place.

Def. Mot, Ex. A ¶ 1; Def. Mot., SOF ¶ 29.

The October Agreement specified that plaintiff would receive a GS-7 salary with retention pay – additional wages provided to make up the difference between her GS-7 salary and her former TR-8 salary.  See Def. Mot., SOF ¶ 30.  The October Agreement further provided that the pay retention would expire when plaintiff vacated the Security Specialist, Adjudicator position.  Id. ¶ 31.  Plaintiff suggested language to be included in the October Agreement that would have allowed her to keep the pay increases she would receive if she stayed on the TR pay scale, but this language was not ultimately included in the Agreement.  See id. ¶ 24.  Plaintiff

---

[6] The February Agreement provided that, if plaintiff believed that defendant failed to comply with the terms of the Agreement, plaintiff was allowed to "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the [EEO] complaint be reinstated for further processing."  Def. Mot., Ex. D at 3.

also requested to see the position description for her new position before signing the October Agreement.  Id. ¶ 25.  Plaintiff saw the position description, which indicated that she would be transferred into a GS-7 position.  Id. ¶ 26.  In December 2008, pursuant to the October Agreement, BEP transferred plaintiff to the Security Adjudicator position at the GS-7 pay level. Id. ¶¶ 37, 40.  Consistent with the terms of the October Agreement, plaintiff received retention pay which brought her actual salary in line with her former TR-8 salary.  See id. ¶ 32.

Although plaintiff began work as a Security Adjudicator following the execution of the October Agreement, the processing of the paperwork needed to formally transfer her to the position was not completed for several months.  Id. ¶ 41.  Due to this administrative delay, plaintiff appeared to be a TR employee and continued to receive TR employee benefits to which GS employees were not entitled, including paid lunch.  Id. ¶¶ 44–45, 47.  Plaintiff also received full step increases during this time.  Id. ¶¶ 41–42.  However, employees receiving retained pay compensation, like plaintiff, are ineligible for these increases.  See 5 C.F.R. § 536.604.  The regulations governing pay retention prohibit an employee on retained pay from receiving her full within-grade increases because the employee is already earning more than she should for the position she occupies.  Def. Mot., SOF ¶ 34.

Once the administrative portion of the transfer was completed, the National Finance Center ("NFC") discovered these discrepancies in plaintiff's pay and benefits.  Id. ¶ 46.  NFC issued a letter to plaintiff indicating that she had been overpaid and that NFC would seek repayment.  Id. ¶ 48.  Subsequently, NFC garnished plaintiff's wages to recoup the overpayments.  Id. ¶ 50.  Plaintiff does not believe that NFC garnished her wages due to her race, age, sex, or because she had engaged in protected EEO activity.  Id. ¶ 49.  NFC withdrew funds from plaintiff's paychecks, which plaintiff claims caused her to bounce her mortgage payment.

Id. ¶ 50.  However, when plaintiff notified BEP of the bounced check, BEP's chief financial officer issued a letter to plaintiff's mortgage company to explain the problem.  Id. ¶ 51.  The mortgage company took no adverse actions against plaintiff and allowed her to remain on her mortgage payment plan.  Id. ¶ 52.  Plaintiff claims she suffered emotional distress as a result of the mortgage issue but admits that she suffered no pecuniary harm.  Pl. Opp., SOF ¶ 52.

Defendant claims that, at the time plaintiff was transferred into the GS-7 Security Adjudicator position, she did not have the qualifications to be compensated at the GS-9 or GS-11 levels.  Id. ¶¶ 38–39.  Plaintiff disputes this, arguing that she had completed several courses prior to her October 2008 transfer which gave her the training and experience required to transfer into a higher pay grade.  See Pl. Opp., SOF ¶¶ 38–39.  This dispute, discussed further below, is not relevant to the disposition of this case.

Hiram Vega, a white, male BEP police officer, was on a detail for approximately three years in BEP's Destruction Section.  Id. ¶ 54.  Mr. Vega was assigned to that detail as a reasonable accommodation for an underlying disability.  Id. ¶ 55.  After serving approximately three years in that detail, Mr. Vega applied and was selected for a permanent position in the Destruction Section.  Id. ¶ 56.  Based on Mr. Vega's three years of experience in the Destruction Section while on detail, he was able to exit his TR-9 law-enforcement position and enter the GS pay scale at GS-9 upon assuming his permanent position in the Destruction Section.  Id. ¶ 57.

## PROCEDURAL HISTORY

On October 20, 2011, plaintiff filed this Title VII and ADEA action.  Plaintiff's Complaint [Dkt. 1].  On May, 1, 2012, plaintiff requested leave to file her First Amended Complaint.  See Am. Compl.  On June 4, 2012, the Court granted leave.  See June 4, 2012

Minute Order.  On February 10, 2014, defendant filed the dispositive motion currently pending before the Court.  Plaintiff responded on April 17, 2014.  Defendant replied on May 7, 2014.

In October 2013, prior to the close of discovery, plaintiff filed a second EEO complaint which alleged she was denied reassignment from her current detail – the one she obtained as a result of the October Agreement – based on race, sex, age, and retaliation.  Pl. Mot. Am., Ex. 1 ¶ 30.  On January 7, 2014, plaintiff was placed on paid administrative leave.  Pl. Mot. Am. at 2.  In August 2014, she resigned.  Pl. Mot. Am., Ex. 1 ¶ 39.  That same month, plaintiff filed a third EEO complaint, this time for constructive discharge.  Id.  On March 20, 2015, the Equal Employment Opportunity Commission denied relief as to these two new EEO complaints.  Id. ¶ 40.  On April 21, 2015, plaintiff moved to amend her complaint in order to include the new claims of discrimination, retaliation, and constructive discharge alleged in the 2013 and 2014 EEO complaints.  Defendant filed its opposition to this motion on May 8, 2015.  Plaintiff did not file a reply.  Defendant's and plaintiff's motions are fully briefed and ripe for disposition.

## LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'"  Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324. In order to establish that a fact is or is not genuinely disputed, a party must (a) cite to specific parts of the record – including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence – in support of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, Grosdidier v. Broad. Bd. of Gov., 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. Anderson, 477 U.S. at 252. Moreover, the non-moving party "may not rest upon mere allegation or denials of his pleadings but must present affirmative evidence showing a genuine issue for trial." Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (internal quotation marks and citation omitted); Ass'n of Flight Attendants–CWA, AFL–CIO v. Dep't of Transp., 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. Anderson, 477 U.S. at 249 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal citations omitted).

It is well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." Barnett v. PA Consulting Grp., Inc., 715 F.3d 354, 358 (D.C. Cir. 2013)

13

(quotation marks and citation omitted).  Indeed, a court's role in deciding a summary judgment

motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a

genuine dispute for trial."  Id.  Moreover, district courts approach summary judgment motions in

employment discrimination or retaliatory action cases with "special caution" due to the

"potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory

intent."  Nurriddin v. Bolden, 40 F. Supp. 3d 104, 115 (D.D.C. 2014).  Nonetheless, a plaintiff is

still obligated to support his or her allegations by competent evidence.  Id.  Accordingly, a

plaintiff may not avoid summary judgment through "conclusory allegations and speculation."  Id.

(citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999)).

> ### B.        Title VII and the ADEA

Under Title VII, it is unlawful for employers "to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin," or retaliate against such individual for

engaging in protected activities such as filing an EEO complaint alleging employment

discrimination.  42 U.S.C. §§ 2000e-2, 2000e-3.  Like Title VII, the ADEA prohibits

discrimination, but addresses discrimination based on a person's age.  29 U.S.C. § 623(a)(1).

When, as here, a Title VII or ADEA plaintiff does not offer direct evidence of discrimination,

courts apply the three-step burden-shifting framework set forth in McDonnell Douglas

Corporation v. Green, 411 U.S. 792 (1973).   See Holcomb v. Powell, 433 F.3d 889, 901 (D.C.

Cir. 2006) (using McDonnell Douglas to evaluate Title VII claims); Teneyck v. Omni Shoreham

Hotel, 365 F.3d 1139, 1154–55 (D.C. Cir. 2004) (applying McDonnell Douglas to ADEA

claims).

Under that framework, the plaintiff must initially prove a prima facie case by a preponderance of the evidence.  McDonnell Douglas, 411 U.S. at 802.  The two essential elements of a Title VII or ADEA discrimination claim are that (1) the plaintiff suffered an adverse employment action (2) because of the plaintiff's race, color, religion, sex, national origin, or age.  Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008).  Similarly, to establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act.  Rochon v. Gonzales, 438 F.3d 1211, 1219–20 (D.C. Cir. 2006).  Once the plaintiff succeeds in making her prima facie showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory reason for the challenged action.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation.  Jones v. Bernanke, 557 F.3d 670, 677 (D.C. Cir. 2009).

An adverse employment action is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."  Baird v. Gotbaum, 662 F.3d 1246, 1248 (D.C. Cir. 2011) (internal quotation marks and citation omitted).  An employee must "experience[ ] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm."  Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002).  "[N]ot everything that makes an employee unhappy is an actionable adverse action."  Russell v. Principi, 257 F.3d 815, 818 (D.C. Cir. 2001).  Instead, the challenged action must usually be accompanied by

direct, negative economic consequences.  Douglas v. Donovan, 559 F.3d 549, 553 (D.C. Cir.

2009).  As our Court of Appeals has explained, the threshold for adverse employment action in

the retaliation context is slightly lower, requiring only harm that "'well might have dissuaded a

reasonable worker from making or supporting a charge of discrimination,'" whether or not that

harm was economic in nature.  Baird, 662 F.3d at 1248 (quoting Burlington N. & Santa Fe Ry.

Co. v. White, 548 U.S. 53, 68 (2006)).

In employment discrimination cases, summary judgment usually focuses on whether the

employer can articulate non-discriminatory reasons for its actions.  Where an employer has done

so, "the district court need not—and should not—decide whether the plaintiff actually made out

a prima facie case."  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008)

(emphasis in original).  Even in Brady, however, the D.C. Circuit implicitly recognized that the

plaintiff must "suffe[r] an adverse employment action" before the reasons for that action, benign

or discriminatory, can be evaluated.  Id.  Both the courts of this District and subsequent panels of

the D.C. Circuit have recognized that proceeding to the Brady analysis may be premature when

the defendant contests whether an adverse employment action occurred at all.  See, e.g.,

Beckham v. Nat'l R.R. Passenger Corp., 736 F. Supp. 2d 130, 146 (D.D.C. 2010); Baloch, 550

F.3d at 1196.

If an adverse employment action occurred, the "one central question" on summary

judgment then becomes whether the employee "produced sufficient evidence for a reasonable

jury to find that the employer's asserted non-discriminatory reason was not the actual reason and

that the employer intentionally discriminated against the employee" on the basis of a protected

class or activity.  Brady, 520 F.3d at 494.  The Court of Appeals has clarified that in answering

the central inquiry of Brady, a district court should "conside[r] whether the jury could infer

16

discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the

plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any

further evidence of discrimination that may be available to the plaintiff or any contrary evidence

that may be available to the employer." Hamilton v. Geithner, 666 F.3d 1344, 1351 (D.C. Cir.

2012) (citation and internal quotation marks omitted).

To rebut her employer's stated reasons for its actions, a plaintiff may, among other

things, come forward with comparative evidence that persons who are similarly situated to the

plaintiff but are of a different race, sex, or age have been treated more favorably by the

employer. Brady, 520 F.3d at 495. A plaintiff is similarly situated to another individual if "all

relevant aspects of her employment situation [are] 'nearly identical' to those of the comparator."

Holbrook v. Reno, 196 F.3d 255, 261 (D.C. Cir. 1999) (quoting Neuren v. Adduci, Mastriani,

Meeks & Schill, 43 F.3d 1507, 1514 (D.C. Cir. 1995)). "If a reasonable juror would be unable to

find that the plaintiff and the comparator were similarly situated, the court may decide, as a

matter of law, that the two are not similarly situated." Id.; see also Phillips v. Holladay Prop.

Servs., Inc., 937 F. Supp. 32, 37 (D.D.C. 1996) ("'It is fundamental that to make a comparison of

a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show

that the 'comparables' are similarly-situated in all respects.'") (quoting Mitchell v. Toledo Hosp.,

964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original)). To demonstrate that her employment

situation is nearly identical to a comparator's, a plaintiff can show that the two had the same

supervisors, background experience, and responsibilities. See Nurriddin v. Goldin, 382 F. Supp.

2d 79, 97–98 (D.D.C. 2005).

A plaintiff may also carry her rebuttal burden with evidence demonstrating that "the

employer is lying about the underlying facts that formed the predicate for the employment

action," Brady, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that the employer's proffered explanation is unworthy of credence," Desmond v. Mukasey, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted). But "if the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying[.]" Brady, 520 F.3d at 495.

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" Barbour v. Browner, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" Fischbach v. Dist. of Columbia Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## DISCUSSION

### A.     Defendant's Motion for Summary Judgment

Plaintiff's allegations amount to three discrete claims. First, plaintiff alleges that defendant coerced her into signing the October Agreement. Am. Compl. ¶¶ 17, 18, 26–27. Second, plaintiff alleges that defendant breached the February Agreement by failing, during and after her transfer to her detail as a Security Adjudicator, to secure for her a GS grade which matched her salary under the TR pay scale. Id. ¶¶ 13–16, 27. Finally, plaintiff alleges that defendant improperly garnished her wages. Id. ¶¶ 28–29. Plaintiff alleges that all three actions were animated by discriminatory or retaliatory motives. See id. at 7–8.

18

Each of plaintiff's three claims fails for different reasons.  Plaintiff's coercion claim falls short because plaintiff's entering into the October Agreement was not an adverse action sufficient to make out either a discrimination or retaliation claim.  Further, there is no evidence that plaintiff was coerced into signing the Agreement, or that defendant's encouragement that she sign the Agreement was animated by discriminatory or retaliatory motive.  Plaintiff's claim for breach of the February Agreement fails because it is a breach of contract claim which must be brought in the Court of Federal Claims and not in this Court.  Additionally, defendant has offered legitimate, non-discriminatory reasons for failing to implement the promises, if any, made in the February Agreement which plaintiff has failed to rebut.  Finally, plaintiff's wage garnishment claim fails because defendant has offered legitimate, non-discriminatory reasons for garnishing plaintiff's wages and plaintiff proffered no evidence demonstrating those reasons to be pretext.  Accordingly, summary judgment is appropriate in defendant's favor.

1.    Coercion and the October Agreement

Of all her claims, plaintiff most strenuously argues that she was coerced into signing the October Agreement by defendant and that defendant was motivated to do so by discriminatory or retaliatory animus.  See Pl. Opp. at 3; Pl. Opp., SOF ¶¶ 30, 33; Am. Compl. ¶¶ 26–27 ("[T]he actions taken by Defendant to develop a new agreement and then to coerce Ms. Lawrence to sign it, was [sic] motivated by race, sex and/or age discrimination and/or retaliation.").[7]  Plaintiff asserts that she only consented to the October Agreement because defendant threatened to return

---

[7] Plaintiff also suggests that merely proposing the adoption of the October Agreement was an adverse employment action which was discriminatory or retaliatory.  See Am. Compl. ¶¶ 17–20, 26–27 ("Defendant provided the 'amendment' because it was motivated by race, sex and/or age discrimination and/or retaliation because Ms. Lawrence had previously engaged in protected activity.").  Plaintiff does not fully develop this argument in her briefing but instead focuses on her claim that she was coerced into signing the Agreement.  See Pl. Opp. at 9.  As explained below, the undersigned finds that plaintiff's allegations of coercion are meritless and do not amount to an adverse employment action.  As a result, it is unnecessary to address the lesser contention that the mere act of proposing the October Agreement to plaintiff is actionable discrimination.

her to her prior work detail if she refused to sign.  Pl. Opp. at 5; Pl. Opp., SOF ¶ 27.  Plaintiff

alleges she had previously been subjected to a hostile work environment in this prior detail.  Pl.

Opp. at 5; Pl. Opp., SOF ¶ 27.

Plaintiff's claims of discriminatory and retaliatory coercion fail for two reasons.  First,

defendant's notification that plaintiff would return to her previous assignment if she did not

consent to the October Agreement was not an adverse employment action because, even

assuming it was a threat, it was never carried out.  Instead, the parties assented to the October

Agreement and plaintiff received her transfer.  For discrimination claims, "mere threats . . . do

not rise to the level of an adverse employment action because they result in no materially adverse

consequences or objectively tangible harm."  Valles–Hall v. Ctr. for Nonprofit Advancement,

481 F. Supp. 2d 118, 144 (D.D.C. 2007); Lutkewitte v. Gonzales, 436 F.3d 248, 271 (D.C. Cir.

2006) (Brown, J., concurring) ("Threats of future adverse actions (whether explicit or implicit)

may culminate in a tangible employment action if carried out, but they do not themselves meet

the standard.").  Indeed, numerous opinions of this Court demonstrate that a threat of termination

"in and of itself[] is not an adverse employment action" for purposes of a discrimination claim.

Weng v. Solis, 960 F. Supp. 2d 239, 250 (D.D.C. 2013); Ali v. Dist. of Columbia Gov't, 810 F.

Supp. 2d 78, 86 (D.D.C. 2011).  If a threat of termination does not qualify as an adverse

employment action, then defendant's threat of transfer in this case certainly cannot.  Therefore,

plaintiff has failed to make out her prima facie case with respect to her discriminatory coercion

claim.

Even under the more lenient standard applicable in retaliation cases, defendant's threat of

transfer was not an adverse action.  As noted above, "[t]he scope of the adverse action

requirement is broader in retaliation cases than in discrimination cases."  Ali, 810 F. Supp. 2d at

88. For a retaliation claim, the plaintiff need only show that she suffered "materially adverse employment action." Burlington, 548 U.S. at 64. Such action is "not limited to discriminatory actions that affect the terms and conditions of employment," but reaches any conduct that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 64–68. This is a fact-specific, highly contextual inquiry, Rattigan v. Holder, 604 F. Supp. 2d 33, 46 (D.D.C. 2009), and contains both subjective and objective components. Howard v. Gutierrez, 237 F.R.D. 310, 313 (D.D.C. 2006).

Thus, "while unrealized threats cannot constitute adverse action in discrimination cases, they can be materially adverse for retaliation purposes." Ali, 810 F. Supp. 2d at 89 (citing Gaujacq v. EDF, Inc., 601 F.3d 565, 578 (D.C. Cir. 2010)). Nevertheless, courts in this District, echoing the Supreme Court in Burlington, have emphasized that "'[t]he anti-retaliation provision [of Title VII] protects an individual not from all retaliation, but from retaliation that produces an injury or harm.'" Valles-Hall, 481 F. Supp. 2d at 155 (quoting Burlington, 548 U.S. at 67). Applying these standards, courts in this District have generally found materially adverse employment action where the employee suffered a "credible threat of termination," Ali, 810 F. Supp. 2d at 89, or was subject to formal disciplinary investigation, Rattigan, 604 F. Supp. 2d at 52; but see Valles-Hall, 481 F. Supp. 2d at 155 (finding that a threat of termination for over-use of sick leave was not materially adverse because it was not carried out).

Here, plaintiff has not adduced facts sufficient to show that defendant's threat of transfer to her former detail constituted materially adverse employment action. Again, it is important to note that a threat of transfer should, as a matter of common sense, be less harmful than a threat of complete termination. Further, transfer back to her old detail would not have diminished plaintiff's pay; instead, she would have remained on the TR pay scale at her applicable grade.

Finally, although plaintiff argues that she feared returning to her prior, hostile work environment, she offers no credible evidence that her fear was anything more than subjective. Rattigan, 604 F. Supp. at 54. In other words, she does not come forward with evidence demonstrating that a reasonable person would have shared her fear. At best, plaintiff proffers vague and self-serving testimony that she was subjected to a hostile work environment in her prior detail because her supervisors investigated an allegation of worker's compensation fraud against her. See Def. Mot., Ex. 1 107:1–8; Def. Mot., Ex. B at 2; Pl. Opp., Ex. 7 ¶¶ 1, 14–16. She does not connect this investigation in any meaningful way to discrimination or retaliation beyond bare assertions to that effect. Moreover, BEP never admitted that her prior work environment was hostile. See Def. Mot., Ex. D ¶ 3 (non-admission of liability clause in February Agreement); Def. Mot., Ex. B ¶ 5 (non-admission of liability clause in October Agreement). As a result, plaintiff fails to show that she suffered a materially adverse retaliatory action.

Second, on its merits, plaintiff's coercion claim, whether based in discrimination or retaliation, fails to satisfactorily rebut defendant's legitimate, non-discriminatory reasons for proposing the October Agreement. Although plaintiff claims that defendant obtained her assent to the Agreement by threatening to return her to her prior, hostile work environment, the uncontroverted facts demonstrate otherwise. Following plaintiff's request for a permanent transfer into the Security Specialist, Adjudicator position, BEP's human resources office informed plaintiff that the February Agreement was insufficient to effect her transfer. Def. Mot. at 3–4; Def. Mot., SOF ¶¶ 18, 21, 23. As a remedy, BEP offered plaintiff the option of either reinstating her EEO complaint and returning to her prior detail, or executing the October Agreement to effectuate her permanent transfer to the Security Adjudicator position with

retention pay.  Def. Mot., SOF ¶¶ 14–15, 53.[8]  Indeed, plaintiff even had a third option:  she could have refused to sign the October Agreement and brought a civil action for specific performance of the February Agreement based on her understanding that its terms alone required her permanent transfer into the Security Adjudicator position.  See Pl. Opp., SOF ¶¶ 10, 14; infra at 25–29.

The dispute between the parties over what the February Agreement required, compare Def. Mot., SOF ¶ 20; with Pl. Opp., SOF ¶ 20, does not annul the choices plaintiff had prior to entering into the October Agreement or convert her decision to execute that Agreement into one motivated by duress.  See Weaver v. Bratt, 421 F. Supp. 2d 25, 32 (D.D.C. 2006) (coercion requires that the plaintiff's assent to a contract be brought on "by moral force or in some other manner with or without physical force").  Indeed, plaintiff's choice was not atypical of many contractual parties who find themselves at odds over the meaning of a contract they have signed.  By signing the October Agreement to resolve that dispute, plaintiff affirmatively represented that she entered the Agreement "voluntarily and was in no way coerced."  Def. Mot, Ex. A ¶ 10.  This Court should be slow to credit plaintiff's attempt to gainsay her settlement as to do so may itself be against public policy.  See Perez v. Goldin, 360 F. Supp. 2d 12, 16 (D.D.C. 2003) (public policy encourages parties to reach settlement agreements); Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1015 (D.C. Cir. 1985) ("Settlement agreements are in high judicial favor" because they "enable the parties to avoid the expense and delay involved in full litigation of the issues and spare the court the burden of trial").  Plaintiff has offered no colorable basis on which to do so here.

---

[8] Defendant's notification was consistent with the terms of the February Agreement itself, which permitted plaintiff to request specific performance of its terms or to request reinstatement of her EEO complaint.  Def. Mot., Ex. D at 3.

Furthermore, plaintiff retained counsel to assist her in negotiating the October Agreement.  Def. Mot., SOF ¶ 22.  The presence of counsel during negotiations relating to the Agreement, or plaintiff otherwise acting pursuant to the advice of counsel, creates a presumption that she knowingly and voluntarily consented to its terms.  Wise v. Riley, 106 F. Supp. 2d 35, 39 (D.D.C. 2000).  The October Agreement also provided plaintiff with twenty-one days to consider its terms and provided a seven-day revocation period.  Def. Mot., SOF ¶ 36; Def. Mot, Ex. A ¶ 10.  These terms were discussed during several meetings over a period of months.  Def. Mot., SOF ¶¶ 21, 23.  Because plaintiff had the assistance of counsel and was provided a generous period to review the Agreement and revoke her assent, any concerns regarding coercion and duress are obviated.  See Wise, 106 F. Supp. 2d at 39; see also Anzueto v. Wash. Metro. Area Transit Auth., 357 F. Supp. 2d 27, 30 (D.D.C. 2004) ("[I]t is well established that a person has a duty to read a contract before he signs it.  If he had the opportunity to read it, he is bound by its terms. . . .").  In sum, based on the undisputed record before the undersigned, the October Agreement was not "a product of anything other than [plaintiff's] own free will."  Johnson v. Penn Camera Exch., 583 F. Supp. 2d 81, 86 (D.D.C. 2008).

Most importantly, there is no evidence that defendant acted with discriminatory or retaliatory intent when its human resources office refused to effectuate plaintiff's permanent transfer to the Security Adjudicator position based on the February Agreement alone, or when the defendant offered the October Agreement as a means to effectuate that transfer.  Therefore, the undersigned recommends that the Court enter summary judgment in defendant's favor on plaintiff's discriminatory and retaliatory coercion claims.

2.     Breach of the February Agreement

Plaintiff's claims related to the February Agreement also fail.  Plaintiff alleges that defendant breached the February Agreement by failing to secure her a salary on the GS pay scale which was equivalent to her former salary on the TR pay scale upon transfer to the Security Adjudicator position.  Am. Compl.  ¶¶ 13–16, 27.  First, this claim must be rejected because it is not a claim for discrimination but for breach of contract.  Such claims may not be brought against U.S. government agencies in this Court but must be brought in the Court of Federal Claims.  Second, to the extent plaintiff has alleged that defendant's actions were motivated by retaliation or discrimination, defendant has offered legitimate, non-discriminatory reasons for its actions which plaintiff has not rebutted as pretextual.

### a.     Breach of Contract

Defendant does not argue in its motion that this Court lacks jurisdiction over any of plaintiff's claims.  Nevertheless, a federal district court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  Grand Lodge of Fraternal Order of Police v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Such courts act within limited jurisdiction and "possess only that power conferred by Constitution and statute."  Kokkonen v. Guardian Life Ins. Co., 511 U.S. 375, 377 (1994).  "As a court of limited jurisdiction, this Court is under a continuing obligation to examine its jurisdiction any time it appears to be in question."  Sturdza v. United Arab Emirates, 658 F. Supp. 2d 135, 137 (D.D.C. 2009); see also Arbaugh v. Y & H Corp., 546 U.S. 500, 507 (2006) ("The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment.").  The Court may neither "overlook a potential defect in its jurisdiction simply because the parties fail to call it to the Court's

attention[,]" nor "presume the existence of jurisdiction in order to dispose of a case on any other grounds." Nikbin v. Islamic Republic of Iran, 471 F. Supp. 2d 53, 58 (D.D.C. 2007) (citation omitted). "If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

Under the Tucker Act, the Court of Federal Claims has exclusive jurisdiction over contract claims against the United States or its agencies seeking damages exceeding $10,000. 28 U.S.C. § 1491(a)(1). Settlement agreements with U.S. agencies constitute contracts for purposes of that jurisdictional provision. Shaffer v. Veneman, 325 F.3d 370, 372 (D.C. Cir. 2003). Breaches of settlement agreements that resolve EEO complaints are, therefore, normally "straightforward contract claims within the purview of the Tucker Act and the jurisdiction of the Court of Federal Claims." Greenhill v. Spellings, 482 F.3d 569, 574 (D.C. Cir. 2007) (citing Hansson v. Norton, 411 F.3d 231, 232 (D.C. Cir. 2005)); Brown v. United States, 389 F.3d 1296, 1297 (D.C. Cir. 2004) (holding that a breach of settlement agreement claim should have been brought in the Court of Federal Claims). If the "'primary thrust of [a] complaint is a breach of contract . . ., then the Court of [Federal] Claims retain[s] jurisdiction over the suit.'" Rochon, 438 F.3d at 1214–15 (quoting Wood v. United States, 961 F.2d 195, 198 (Fed. Cir. 1992)). District courts can exercise jurisdiction over Title VII claims relating to a settlement agreement only if "the essence of the claims requires interpreting Title VII, not a contract." Allen v. Napolitano, 774 F. Supp. 2d 186, 196 (D.D.C. 2011); Greenhill, 482 F.3d at 575 (finding no jurisdiction because "even though Title VII might have been the basis of a settlement agreement, a breach claim is a straightforward contract dispute"). In other words, jurisdiction over such claims only lies in the district court "when a settlement agreement incorporates substantive

provisions of federal law such that enforcement of the agreement requires the interpretation and application of federal law." Hansson, 411 F.3d at 234.

This Court lacks jurisdiction over plaintiff's claims related the February Agreement. In this action, plaintiff seeks $300,000 in compensatory damages alone. Am. Compl. at 9. Her claims therefore well exceed the minimum jurisdictional amount under the Tucker Act. Additionally, although plaintiff characterizes her claims relating to the February Agreement as claims for discrimination and retaliation, see Pl. Mot. Am. at 12, those claims represent nothing more than an ordinary contract dispute.

In her complaint, plaintiff alleges that defendant "breached the [February] Agreement." Am. Compl. ¶ 27; id. ¶ 1 (seeking relief for "intentional breach of a settlement agreement"). Further, in her opposition to defendant's motion, plaintiff argues that defendant violated the terms of "the bargained for contract" – the February Agreement. See Pl. Opp., SOF ¶ 20. Likewise, plaintiff contends that defendant failed to make sufficient effort to obtain for her what was promised under the February Agreement; namely, permanent transfer to her new position at the GS-9 level. Id. ¶ 53 (claiming that "any real steps to take to get [plaintiff] what she was promised were not taken"); Pl. Opp. at 3 ("[Defendant] did not comply with the conversion provisions of the Settlement Agreement."); id. at 9 (arguing that "a critical promise made by [defendant]" in the February Agreement "was not kept" and that defendant "reneg[ed] on the settlement terms").

The primary thrust of plaintiff's claims, then, is not discrimination but breach of the terms of the February Agreement. In essence, plaintiff complains that defendant failed to make a sufficient effort to perform its obligations under the Agreement. While she claims that this breach was actuated by discriminatory or retaliatory motives, "[f]ailure to carry out obligations

under a settlement agreement . . . is the hallmark of a breach of contract claim, not a retaliation claim." <u>Allen</u>, 774 F. Supp. 2d at 196.

Moreover, the parties vigorously dispute what precisely was required by the language of the February Agreement.  Defendant claims that it only needed to "make efforts" to secure the permanent transfer plaintiff desired, while plaintiff contends that the Agreement unequivocally mandated that she be given a permanent transfer at her desired salary grade.  <u>Compare</u> Def. Mot., SOF ¶ 20, <u>with</u> Pl. Opp., SOF ¶ 20.  Interpretation of the February Agreement does not require interpretation or application of Title VII or the ADEA; instead, it requires resort to principles of contract law.  <u>See</u> <u>Hansson</u>, 411 F.3d at 234.

Accordingly, plaintiff's claims related to the February Agreement fall squarely within the exclusive jurisdiction of the Court of Federal Claims and outside the jurisdiction of this Court. <u>See</u> <u>Bowden v. Clough</u>, 658 F. Supp. 2d 61, 78 (D.D.C. 2009) (dismissing claim for failure to provide reasonable accommodations according to terms of a Title VII settlement agreement); <u>Murthy v. Schafer</u>, 579 F. Supp. 2d 110, 114 (D.D.C. 2008) (dismissing claim that was "overwhelmingly, a contractual claim relating to Title VII"); <u>Robinson v. Salazar</u>, Civil Action No. 10–1577 (CKK), 2011 WL 1344729, at *1 (D.D.C. Apr. 8, 2011) (transferring suit to Court of Federal Claims where plaintiff's Title VII claims centered on whether defendant breached a settlement agreement); <u>Schmidt v. Shah</u>, 696 F. Supp. 2d 44, 61 (D.D.C. 2010) (dismissing Title VII claim which "attack[ed] . . . compliance with the terms of the Settlement Agreement"); <u>Perkins v. Vance-Cooks</u>, 886 F. Supp. 2d 22, 28 (D.D.C. 2012) (dismissing claim that defendant failed to pay amounts due under Title VII settlement agreement).  Because plaintiff cannot bring a breach of contract claim under these circumstances in this Court, the Court should dismiss plaintiff's claims related to the February Agreement for lack of subject-matter jurisdiction.

### b.       Discrimination and Retaliation

Even if plaintiff's claims related to the February Agreement were properly viewed as Title VII and/or ADEA claims, defendant has offered legitimate, non-discriminatory reasons for failing to implement the promises, if any, made in the February Agreement which plaintiff has failed to rebut.  Defendant argues that transferring plaintiff to a lower GS pay grade (albeit with the same pay as she enjoyed previously as a police officer) via the October Agreement was legitimate and non-discriminatory because the February Agreement did not properly effectuate plaintiff's permanent transfer from the TR pay scale to the GS pay scale.  Def. Mot. at 3–4; Def. Mot., SOF ¶¶ 21, 28.  According to defendant, the February Agreement was ineffective because a 1990 BEP policy prevented plaintiff's transfer from the TR pay scale to an identical salary on the GS pay scale.  Def. Mot., SOF ¶ 57; Def. Mot., Ex. V.  Defendant therefore had a legitimate, non-discriminatory reason for proposing plaintiff's transfer to the lower GS pay grade in the October Agreement.

Plaintiff first tries to discredit defendant's asserted reason by referring to two comparators whom she alleges were similarly situated to herself but were treated more favorably – namely, Hiram Vega and Andre Mallory.  Pl. Opp. at 5.  Plaintiff alleges that Mr. Vega, a white male, was transferred from a TR-8 law-enforcement position to a GS-9 civilian position – higher than the GS-7 grade level plaintiff received with her transfer.  Id.  Plaintiff's reliance on Mr. Vega's transfer is misplaced, however, as it was materially different from her own.  See Holbrook, 196 F.3d at 261 (requiring that a comparator's situation be nearly identical to the plaintiff's).  Mr. Vega was detailed to BEP's Destruction Section to accommodate an underlying disability.  Def. Mot., SOF ¶¶ 54–55.  After working that detail for three years, he applied through a competitive process for a GS-9 position in the Destruction Section.  Id. ¶¶ 55–56.  Mr.

Vega was selected, which resulted in his promotion to the GS-9 position.  Id. ¶ 57.  Thus, unlike plaintiff, Mr. Vega was competitively selected for a GS-9 position after accruing three years of experience working in the same detail.  See Nurriddin, 382 F. Supp. 2d at 97–98 (comparators are not "similarly situated" to the plaintiff when they do not share the same background experience).

Plaintiff argues that she had the required qualifications to transfer into her new position at a grade higher than GS-7.  Pl. Opp., SOF ¶ 38.  Yet her evidence in support of that assertion consists of nothing more than a self-serving declaration and two certificates of completion for training in "personnel security and suitability adjudication."  Response to Order to Show Cause [Dkt. 31], Exs. 3, 4, 7.  Plaintiff's self-serving statement that she had the qualifications for GS-11 pay, see Response to Order to Show Cause [Dkt. 31], Ex. 7 ¶ 37, cannot alone support a genuine dispute as to that fact.  Anderson, 477 U.S. at 248; Musgrove v. Dist. of Columbia, 775 F. Supp. 2d 158, 170 (D.D.C. 2011) ("[S]elf-serving testimony alone . . . is insufficient to survive a motion for summary judgment.").  Additionally, plaintiff does not demonstrate how the training courses she completed helped her meet the qualifications for the GS-9 Security Adjudicator position.  See Def. Mot., Ex. O.  By proffering these two certificates, plaintiff asks this Court to speculate regarding the content of plaintiff's training, which is something it cannot do. Nurriddin, 40 F. Supp. 3d at 115.

In any event, even if the Court credited plaintiff's evidence as raising a genuine dispute of fact, the fact is not material.  Mr. Vega – with his three years of on-the-job experience in the GS-9 position for which he was competitively selected – is not a proper comparator in this case. Phillips, 937 F. Supp. at 37.[9]  Because Vega had vastly more on-the-job experience than plaintiff

_____

[9] Plaintiff correctly asserts that there is no mention in any of the memoranda regarding TR-GS transfers about the use of experience to bypass the 1990 BEP policy.  Pl. Opp., SOF ¶ 57; Def. Mot., Ex. V at 4–14.  Plaintiff further

at the time of his transfer, defendant had a legitimate, non-discriminatory reason for treating him differently from her.  As a result, it does not matter for purposes of defendant's motion whether plaintiff had the training she claims to have had.[10]

Plaintiff also contends that a younger African-American male, Andre Mallory, was treated more favorably than herself.  See Def. Mot., Ex. 1 199:4–16.  Beyond this bare assertion, however, plaintiff provides no evidence about Mr. Mallory, his qualifications, how he was similarly situated to plaintiff, or how he was treated more favorably than her.  See id.  Plaintiff's vague, unsupported allegations do not qualify as "specific facts showing that there is a genuine issue for trial."  See Anderson, 477 U.S. at 248.  Plaintiff has not shown that Mr. Mallory is similarly situated to her, and thus he cannot be a comparator.  As a result, plaintiff's proffered comparative evidence is insufficient to rebut defendant's legitimate, non-discriminatory reasons for its actions.[11]

---

argues that Mr. Vega's transfer to a GS-9 position indicates that BEP had the power to override its policy and that it did so in Mr. Vega's situation but not hers.  Pl. Opp., SOF ¶¶ 56–57.  However, these arguments miss the mark.  Mr. Vega did not transfer to a new work detail.  Instead, he applied through a competitive process for a promotion which gave him GS-9 status.

[10] Notably, plaintiff was later promoted to GS-9 and then to GS-11 after garnering experience in her new position.  See Def. Mot. at 20; Def. Reply at 13 n.9; Def. Mot., Ex. P at 16–18.

[11] Not only has plaintiff failed to come forward with persuasive comparative evidence, defendant has proffered its own evidence that a comparator was treated similarly to plaintiff.  Before the new TR-GS transfer structure took effect in 2012, a white male, Edgar Harris, was transferred from a TR-8 police officer position to a GS-7 position like plaintiff.  Def. Mot., SOF ¶ 16.  Mr. Harris applied for his position and lost pay because he switched pay scales.  Def. Mot., Ex. 1 142:22–143:25.  At the time of his transfer, Mr. Harris had more experience than plaintiff did when she was transferred.  Id. 144:5.  Plaintiff admitted that they both should have been treated equally.  Id. 200:6–9.  Plaintiff now argues that the admission she made in her deposition was the result of confusion about whom she was speaking.  Pl. Opp., SOF ¶ 17.

Whether or not plaintiff's admission binds her, plaintiff asserts in her opposition that her situation is not comparable to Mr. Harris'.  Plaintiff reasons that Mr. Harris' circumstances differ because he voluntarily applied for a vacancy and was not promised a "change to GS pay scale at 'the matching grade level for her current pay scale.'"  Id. ¶ 16.  Assuming without deciding that plaintiff is correct here, her argument underscores why Mr. Vega is not an appropriate comparator.  Like Mr. Harris, Mr. Vega voluntarily applied for and received a promotion.  Thus, even if Mr. Harris' situation does not demonstrate that plaintiff was treated equally to a white male employee, at minimum it reinforces why plaintiff's proposed comparators are insufficient.

Next, plaintiff attempts to rebut defendant's reasons by arguing that defendant made no effort to change the 1990 BEP policy governing how TR employees are transferred into the GS pay scale or make an exception to the policy in plaintiff's case.  Pl. Opp. at 9–11.  Plaintiff asserts that Chief Levy's failure to expressly ask then-Associate Director of Management Scott Wilson to make an exception for plaintiff is indicative that no efforts were made to fulfill the promises in the February Agreement.  Id.  Plaintiff concludes that defendant's motive for transferring her into a lower pay grade must therefore have been discriminatory or retaliatory.

The problem with plaintiff's argument is twofold.  First, defendant made significant, albeit unsuccessful, efforts to align the TR and GS pay scales following the February Agreement.  Plaintiff's supervisor, then-Chief Levy, wrote a memorandum in June 2008 advocating for change in the TR-GS transfer structure which was addressed to the Manager of the Office of Human Resources, Karen Bickle, and was copied to Associate Director Wilson.  Def. Mot., Ex. V at 3–5.  The memorandum, drafted after numerous discussions on the topic, specifically "challenge[d] the logic" upon which the transfer structure was based and explained Chief Levy's concerns with the unfairness imposed upon a BEP employee who transferred from a TR law enforcement position into a civilian GS position.  Id.  Chief Levy concluded:

> By not allowing TR personnel to be reassigned into non-police GS positions throughout the organization Treasury bureaus are hindering themselves without perceived benefit.  Vast experience and skill sets are being missed because of artificial limitations on exit grades.
>
> . . . The Office of Security asserts that exiting of the TR pay scale should be based solely on the highest previous rate of pay for each employee.  This will allow any exiting police officer or manager to compete on a level playing field with all other civil servants for positions equal to their experience.  It comes at no additional cost to the Treasury in that these employees are already being paid at their current salary rate.  We are proposing the ability to reassign them into GS positions as needed at no additional cost to the government – however – at no reduction of employee salary either.

32

Id. at 5.  Nevertheless, despite Chief Levy's efforts, no change was made to the TR-GS transfer policy in 2008.  See Def. Mot., SOF ¶¶ 14–15.

Second, plaintiff offers no credible evidence that the failure to effectuate a change in the TR-GS transfer policy in 2008 or make an exception thereto was the result of discriminatory or retaliatory animus directed towards her.  The 1990 policy, and the failure to change it, impacted BEP law enforcement employees other than the plaintiff who were seeking transfer to civilian positions.  The fact that employees other than plaintiff were impacted by the policy does not advance her claim of disparate treatment.[12]  If anything, the fact that a pay-retention provision was included in the October Agreement demonstrates defendant's desire to treat plaintiff fairly despite that policy.  Id. ¶ 30.  At most, plaintiff has shown that her transfer from a TR-8 to a GS-7 position in 2008 was the result of her employer following its own policies.  As the Court of Appeals has instructed, "even if a court suspects that an [employee] was victimized by poor . . . procedures it may not second-guess an employer's personnel decision absent demonstrably discriminatory motive."  Fischbach, 86 F.3d at 1183 (alterations in original omitted).

Plaintiff argues that "a major factual dispute between the parties" exists as to whether Associate Director Wilson had the authority to approve plaintiff's transfer to the GS-9 level by overriding the 1990 BEP policy.  Pl. Opp., SOF, ¶ 53.  Plaintiff points to a memorandum drafted in 2013 for Chief Levy in his new capacity as Associate Director.  Id.  This memorandum requests Chief Levy's approval for a change in pay grade equivalencies between the TR and GS pay scales.  Def. Mot., Ex. V at 1.  Plaintiff suggests that if Chief Levy had the power as

---

[12] Chief Levy's memorandum mentions other BEP employees impacted by the 1990 policy.  Def. Mot., Ex. V at 3–5.  Plaintiff argues that the fact that she was not mentioned in Chief Levy's memorandum, when other employees were, is evidence of illegal animus directed towards her.  Pl. Opp. at 10.  The undersigned disagrees.  Whether plaintiff was mentioned by name in Chief Levy's memorandum is immaterial.  The undisputed fact remains that, in the months following the February Agreement, Chief Levy advocated for a change in the 1990 policy that would have worked to plaintiff's advantage had his efforts been successful.

Associate Director to approve new pay grade equivalencies, Mr. Wilson must therefore have had at minimum the power to make an exception to the 1990 policy for plaintiff in 2008 when he occupied the Associate Director position.  Pl. Opp., SOF ¶ 53.

Plaintiff's argument is misguided.  Nothing in the 2013 memorandum suggests that Associate Director Wilson had the power to make an exception to the TR-GS transfer policy for plaintiff in light of the February Agreement.  The 2013 memorandum reveals that the 1990 BEP policy had been amended such that it no longer forestalled a change in the transfer structure.  See Def. Mot., Ex. V at 1.  The 2013 memorandum therefore proposed a change in that structure.  Id. Chief Levy's approval of this new transfer structure in 2013 after amendment of the 1990 policy does not shed light on the power of Associate Director Wilson in 2008 to grant an exception to the 1990 policy for plaintiff's benefit, or that he should have done so even if he was so empowered.  Assuming that Wilson, like Levy, had the power to approve a change in BEP's overall transfer policy as Associate Director, plaintiff offers no evidence that Wilson could also grant individualized exceptions to that policy.  Further, as discussed above, plaintiff offers no evidence that defendant's failure to overhaul the policy was motivated by discriminatory or retaliatory animus directed at her.

Plaintiff has thus failed to rebut the evidence proffered by defendant – namely, that the 1990 BEP policy was in full force and effect in 2008 and that, despite Chief Levy's efforts to alter it, no change or exception was permitted.  The record shows that defendant reasonably believed that it made efforts to secure plaintiff's transfer to an equivalent GS salary.  Plaintiff has failed to rebut the reasons for defendant's actions as pretext for discrimination or retaliation. Accordingly, even if plaintiff's claims related to breach of the February Agreement could be

heard in this Court, the undersigned recommends that summary judgment be granted to defendant on these claims.

### 3.  Wage Garnishment

Finally, plaintiff's claims of discrimination and retaliation based on wage garnishment fail because defendant has offered legitimate, non-discriminatory reasons for its actions which plaintiff has again failed to rebut.  There was a significant delay in processing plaintiff's transfer paperwork following execution of the October Agreement.  Def. Mot., SOF ¶ 41.  This meant that plaintiff was treated administratively as a TR employee, not a GS employee, for a several months.  Id.  As a result, plaintiff received paid lunches – a benefit extended to TR employees but not GS employees.  Id. ¶¶ 42, 44–45. 47.  Additionally, due to the administrative delay, plaintiff received full step increases during her period of pay retention following transfer.  Id. ¶¶ 32, 43.  One consequence of pay retention, however, is forgoing full step increases.  See 5 C.F.R. §§ 536.304–.305; Def. Mot., SOF ¶¶ 42, 47.  When NFC learned of these mistakes, it garnished plaintiff's wages to recoup the overpayments.  Id. ¶ 50.

For these reasons, defendant reasonably believed it was required to garnish plaintiff's wages.  Def. Mot., SOF ¶¶ 42, 47–48; Fischbach, 86 F.3d at 1183 ("[T]he issue is not 'the correctness or desirability of [the] reasons offered . . . [but] whether the employer honestly believes in the reasons it offers.'") (quoting McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) (alterations in original)).  Here again, plaintiff was at worst a victim of an internal procedural error which the undersigned cannot second-guess.  See id. Plaintiff provides no credible rebuttal evidence showing that the administrative delay or NFC's garnishment were motivated by discriminatory or retaliatory animus.  See Pl. Opp., SOF ¶¶ 41– 49.  Indeed, plaintiff admits that she does not believe that NFC garnished her wages due to her

sex, age, race, or in retaliation for her participation in protected EEO activity.  Id. ¶ 49.[13]  In

short, although it is unfortunate that plaintiff suffered garnishment as a result of defendant's

errors, such garnishment cannot support Title VII or ADEA relief.  Accordingly, summary

judgment is appropriate in defendant's favor.

### B.    Plaintiff's Motion to Amend

The undersigned finds that plaintiff's request to amend her complaint should be denied

because it is an eleventh-hour attempt to avoid dismissal of her suit.  On April 21, 2015, well

after the close of discovery in December 2013, plaintiff filed a motion to amend her First

Amended Complaint.  See Pl. Mot. Am.  Plaintiff seeks to add allegations that she was denied a

reassignment away from her Security Adjudicator position on the basis of race, sex, age, and

retaliation.  Id., Ex. 1 ¶¶ 30–41.  Further, plaintiff alleges she was constructively discharged from

BEP.  Id.  These allegations were raised in two EEO complaints filed in 2013 and 2014,

respectively.  See id.

Federal Rule of Civil Procedure 15 permits a party to amend a pleading as a matter of

course within twenty-one days after service.  Fed. R. Civ. P. 15(a)(1).  Once that grace period

has elapsed, "a party may amend its pleading only with the opposing party's written consent or

the court's leave.  The court should freely give leave when justice so requires."  Id. 15(a)(2).

Leave should typically not be denied unless "there is a good reason to the contrary."  Gordon v.

Courter, Civil Action No. 14–1382 (CKK), 2015 WL 4602588, at *3 (D.D.C. July 31, 2015).

---

[13] Plaintiff argues that she suffered harm from defendant's garnishment because it caused her to bounce a mortgage check.  See Pl. Opp., SOF ¶ 51.  Yet defendant, once it learned of the bounced check, wrote to plaintiff's mortgage company directly and convinced the mortgage company not to take adverse action against her.  Def. Mot., SOF ¶¶ 51–52.  Plaintiff admits she suffered no financial harm as a result of her bounced check but alleges that she nevertheless suffered emotional distress.  Pl. Opp., SOF ¶ 52.  Plaintiff fails to explain how defendant's overt efforts to mitigate the effects of garnishment could cause her emotional distress.  Defendant's intervention on plaintiff's behalf underscores the fact that garnishing plaintiff's wages was not motivated by discriminatory or retaliatory motives.

Granting or denying leave to amend a complaint is committed to the discretion of the trial court.
Id.

Reasons warranting denial include "undue delay, bad faith or dilatory motive on the part
of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue
prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of
amendment[.]" Foman v. Davis, 371 U.S. 178, 182 (1962). Courts should consider "the length
of delay between the latest pleading and the amendment sought" and whether the amendment
"would unduly increase discovery or delay the trial." Djourabchi v. Self, 240 F.R.D. 5, 13
(D.D.C. 2006). Undue prejudice or delay can be found when a motion to amend sets forth facts
or claims that do not "flow from the first set of claims," Childers v. Mineta, 205 F.R.D. 29, 32
(D.D.C. 2001), or where a substantive relationship does not "exist between the new claims
sought to be added and the original," Mississippi Ass'n of Cooperatives v. Farmers Home
Admin., 139 F.R.D. 542, 544 (D.D.C. 1991).

Additionally, one of the "most important factor[s]" to consider is "the possibility of
prejudice to the opposing party." Djourabchi, 240 F.R.D. at 13. When a new claim only bears a
tangential relationship to the existing claims, the plaintiff suffers no prejudice by the denial
"because [she] can [later] file an independent challenge," Nat'l Treasury Employees Union v.
Helfer, 53 F.3d 1289, 1295 (D.C. Cir. 1995), but the defendant is prejudiced because it would be
entitled to additional discovery and the defendant may have conducted initial discovery much
differently if it had known of the new claim. See Atchinson v. Dist. of Columbia, 73 F.3d 418,
426 (D.C. Cir. 1996); see also Williams v. Dombeck, 203 F.R.D. 10, 11–12 (D.D.C. 2001)
(denying plaintiff's motion to amend, which would add new factual allegations and claims,
because granting the motion "would delay resolution of the case").

Here, good cause exists to deny plaintiff leave to amend her complaint.  First, plaintiff's proposed amendment alleges new facts that will change the scope of this litigation, delay trial, and prejudice defendant.  Plaintiff seeks to add allegations relating to her 2013 and 2014 EEO complaints.  Plaintiff initiated the 2013 claim because she believes she was subjected to another hostile work environment in her new position as Security Adjudicator.  Pl. Mot. Am., Ex. 1 ¶¶ 30–40.  She further alleges that her superiors denied her reassignment requests on the basis of her race, sex, age, and retaliation.  Id.  After being placed on paid administrative leave for several months, plaintiff resigned.  Id.  Her 2014 EEO complaint alleges she was constructively discharged from her job.  Id.

Allowing the complaint to be amended would entitle defendant to additional discovery because the amended complaint contains new facts and claims.  The 2013 EEO complaint has nothing to do with plaintiff's extant claims regarding settlement of the 2007 EEO complaint and plaintiff's transfer to her Security Adjudicator position.  Rather, it concerns only subsequent, unrelated grievances arising from plaintiff's work in that new position.  Likewise, the 2014 EEO complaint merely continues down the path of the 2013 EEO complaint – it does not flow out of the original allegations relating to the settlement of the 2007 EEO complaint and plaintiff's transfer from a TR to a GS position.  As such, defendant would be unduly prejudiced if leave was granted because discovery has closed, the motion to amend was filed late in the litigation process, and significant new discovery would be needed.[14]

---

[14] Regarding the 2014 EEO complaint, plaintiff contends, in part, that she was constructively discharged for engaging in prior EEO activity.  Pl. Mot. Am. at 2.  However, she does not specify which prior EEO activity on which she bases her retaliation claim.  She could be referring to the 2013 EEO complaint, which involves complaints against her new supervisors, or the 2007 EEO complaint that gave rise to the February and October Agreements.  Obviating any concerns the undersigned has about links between the proposed amendments and the original 2007 EEO complaint is the fact that plaintiff argues that her 2013 and 2014 EEO complaints arise from alleged disparate treatment she faced in her post-transfer position.  See id.

Second, plaintiff's motion should be denied as dilatory.  The proposed amendment comes

at the last minute when plaintiff faces dismissal through summary judgment.  A motion to amend

the complaint cannot be used as "an effort to evade summary judgment."  <u>Key Airlines, Inc. v.</u>

<u>Nat'l Mediation Bd.</u>, 745 F. Supp. 749, 752 n.9 (D.D.C. 1990).  Here, leave should not be

granted because allowing the amendment does not change how the Court should rule on the

summary judgment motion.  <u>See</u> <u>Alexander v. Washington Gas Light Co.</u>, 481 F. Supp. 2d 16,

40 (D.D.C. 2006) (noting that "none of the amendments that plaintiff [proposed] . . . would

change the end result of the dismissal of this action").  If plaintiff desires to institute a new action

based on her 2013 and 2014 EEO complaints, she may seek to do so.  The instant suit is not a

proper venue for that dispute, however, particularly at this late hour in the case.

## CONCLUSION

Summary judgment is appropriate in defendant's favor as to all of plaintiff's claims.

First, plaintiff has failed to show how defendant's actions surrounding the negotiation of the

October Agreement constitute adverse employment action.  Further, assuming that those actions

were adverse, defendant has offered legitimate, non-discriminatory reasons for those actions.

Second, plaintiff's claims related to the February Agreement must be dismissed because they

constitute breach-of-contract claims that may only be brought in the Court of Federal Claims.

Additionally, to the extent plaintiff's claims related to the February Agreement implicate

discrimination and retaliation concerns, defendant has offered satisfactory reasons for its actions.

Third, plaintiff's claims related to wage garnishment fail because defendant has justified its

actions with non-discriminatory reasons.  Moreover, as to all of plaintiff's claims, plaintiff has

failed to rebut any of defendant's reasons for its actions as pretext masking discriminatory or

retaliatory intent.  Finally, plaintiff's motion to amend her complaint seeks to incorporate facts

and claims that are merely tangential to her extant claims.  Amendment would prejudice defendant and cause undue delay.  Therefore, the undersigned recommends that the Court grant defendant's motion for summary judgment and deny plaintiff's motion for leave to file an amended complaint.

The parties are hereby advised that failure to file timely objections to the findings and recommendations set forth in this report may waive your right of appeal from an order of the District Court adopting such findings and recommendations.  See Thomas v. Arn, 474 U.S. 140 (1985).

Date:  December 4, 2015                     _____

                                            G. MICHAEL HARVEY
                                            UNITED STATES MAGISTRATE JUDGE